SPRINT SPECTRUM L.P. d/b/a Sprint PCS, Plaintiff,

v.

Richard P. MILLS, individually and as Commissioner of the New York State Department of Education, Charles A. Szuberla, individually and as Coordinator, Facilities Management and Information Services of the New York State Department of Education, and Carl T. Thurnau, individually and as Acting Supervisor of the New York State Department of Education, Office of Facilities Planning, Defendants.

No. 99CIV.1041(BDP).

United States District Court, S.D. New York.

Dec. 20, 2000.

See also, 65 F.Supp.2d 148.

David L. Snyder, Snyder & Snyder, Tarrytown, NY, for Plaintiff.

Lawrence W. Reich, Ingerman Smith L.L.P., Northport, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER

BARRINGTON D. PARKER, Jr., District Judge.

In a motion pursuant to the All Writs Act, 28 U.S.C. Sec. 1651, plaintiff Sprint Spectrum L.P. d/b/a Sprint PCS ("Sprint") seeks to compel the Ossining Union Free School District (the "District") to permit Sprint to install a cellular telephone tower on the roof of the Ossining New York High School pursuant to an existing, but disputed, lease agreement between Sprint and the District.

The District contests this Court's jurisdiction under the All Writs Act on the grounds that the remedy sought by Sprint is unrelated to this Court's prior injunction permitting the construction of the tower and that the disputed contractual provision is a matter for the state courts to resolve, one that does not implicate the Telecommunications Act ("TCA") of 1996, 47 U.S.C. § 332 et seq.

## BACKGROUND

The motion before the Court is part of a larger dispute involving Sprint and various state and local governmental officials. In prior proceedings in this case, this Court determined that Sprint was entitled to a permit to place its cell tower on the High School and ordered injunctive relief against the New York State Board of Education. See Sprint Spectrum, L.P. v. Mills, 65 F.Supp.2d 148, 161 (S.D.N.Y. 1999). Familiarity with that opinion is assumed.

In that opinion, this Court found that Sprint, pursuant to an FCC auction, won the right to provide digital cellular services to the New York/New Jersey metropolitan region and in order to provide an appropriate level of service, the Ossining High School was an essential site for a cell tower. Sprint contracted with the District to use the rooftop of the school for a cellular phone transmission tower, which was to be disguised as a flagpole.

On September 23, 1998, Sprint signed a lease with the District. When Sprint sought construction approval from the State Board of Education, the Board summarily denied the application on the ground that the District lacked authority to enter the contract since, in violation of the New York Constitution, it provide for the private use of public property. Following that denial, Sprint sought injunctive relief in this Court.

After litigation, this Court granted Sprint injunctive relief on August 27, 1999 determining that the Department's denial was not based on the required "substantial evidence." This Court also rejected the Board's Constitutional challenge under Article 8, Section 1 of the New York Constitution prohibiting "the gift, grant or loan of public property to a private party." Specifically, the Court noted that:

"Congress has expressly emphasized that providing wireless telephone services furthers an important public purpose as the federal statute under which plaintiff was issued its PCS license communicates. The statute ... directs the Commission to issue wireless communications licenses, to make available, so far as possible, to all the people of the United States, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at

reasonable charges, for the purposes of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communication . . . . "

65 F.Supp.2d at 155.

This Court also found

". . . that in denying Sprint's application to install a telecommunications tower in the form of a flagpole, defendants violated 47 U.S.C. § 332(c)(7)(B)(i)(II). Defendants have suggested that, in their view, the leasing of school property to a telecommunications company for installation of a site would be impermissible because such a lease would invariably allow the use of public property solely for the benefit of a private party. The Department asserts that, as a consequence, such leases violate Article 8 Section 1 of the New York Constitution and § 403–a of New York Education Law. In addition to concluding that our understanding of the law does not compel or authorize this result, we also note that defendant's position, if accepted, would bar telecommunications companies from installing facilities on any public school property and, contrary to explicit congressional policy, would frustrate rapid deployment of the new digital PCS technology."

65 F.Supp.2d at 158.

Following this Court's August 1999 injunction, the State engaged in further delay. During a conference some weeks later, the Court learned that the state had still refused to issue the permit. Following additional arguments before the Court, the state finally issued the required permit on October 1, 1999.

Since that point in time more than one year ago, Sprint has still been unable to erect the tower. This time, however, the intransigence arises from the District. Following extensive negotiations with the District, on July 5, 2000, Sprint sent a construction crew to the school site but the crew was turned away because the District believed that Sprint had not complied with certain provisions of the lease concerning the level of radio frequency emissions ("RF Emissions") from the proposed tower.

RF Emissions were an important problem in the evolution of the TCA. In 1996, after seeking consensus among participating experts and after public notice and comment, the FCC adopted guidelines for human exposure to radio frequency emissions from FCC-regulated transmitters and facilities. The guidelines were required by the National Environmental Policy Act, 42 U.S.C. 4321 et seq., and the Council on Environmental Quality regulations promulgated thereunder, see 40 C.F.R. 1500.1 et seq. See Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation, 11 F.C.C. Red. 15123 (1996) (the "Federal RF Safety Standard"). See Cellular Phone Taskforce v. FCC, 205 F.3d 82, 87–89 (2nd Cir.2000) for a brief history of the Federal RF Safety Standard.

The Federal RF Safety Standard, which was authorized under § 704 of the Telecommunications Act of 1996, plays a central role in the siting of wireless telecommunications facilities. Section 704 of the Telecommunications Act provides in relevant part, that:

"No State or local or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions." 47 U.S.C. § 332(c)(7)(B)(iv).

Sprint claims that, in direct contravention of § 704, the District has refused to permit Sprint to install and modify the Facility, even though there is no dispute that the Facility will fully comply with FCC regulations concerning RF Emissions.

The District advised plaintiff that it would not permit Sprint to install the Facility, unless Sprint agreed to operate the Facility at an RF emission level set in October 1998. The September 9, 1998 lease expressly provided that Sprint shall comply with "all current FCC regulations pertaining to radio frequency emissions." (Paragraph 1b). In October 1998, the District informed Sprint that, because of community health concerns, the District would not permit construction of the Facility unless Sprint agreed to limit radio frequency emissions to a level 13,000 times below the applicable federal standard. In a lease addendum dated October 21, 1998, Sprint agreed to this limitation, but with the proviso that it would apply "only to the Sprint Spectrum, L.P. antenna configuration, **as originally installed** (emphasis supplied)."

Sprint contends that the need to make future system modifications and improvements, based on rapid advancements in wireless technology, was anticipated in the Lease which provides that: "SSLP may at its expense make such improvements on the site as it deems necessary from time to time for the operation of [Sprint's] system" (Paragraph 7) and that the "as originally installed" language is consistent with, and anticipated by, Paragraph 7.

The District does not dispute that Sprint has the right to modify or improve its technology. Instead, the District argues that, if Sprint does, it must still comply with its commitment to operate at an RF Emission level 13,000 times below the mandated standard. On that basis, Sprint was prohibited from erecting the tower.

Sprint, maintaining that the District's position is unlawful, inconsistent with the text of the addendum and lease, if accepted will frustrate implementation of this Court's August 27, 1999 Injunction, seeks relief under the All Writs Act.

## DISCUSSION

### I.

■ As an initial matter, the District challenges this Court's jurisdiction under the All Writs Act, on the grounds that because it was not a party to the (now discontinued) underlying action involving the State Board, this Court cannot, consistent with due process, exercise jurisdiction over what is essentially a common law contractual dispute with Sprint.

The District contends that this Court's prior injunction involved only the issuance of a permit by the State Board of Education. The District maintains that once a permit was issued, and once this case was voluntarily dismissed, nothing it can do can frustrate the injunction since it has been complied with fully. Thus, according to the District, the All Writs Act does not apply. This narrow contention misconstrues the relationship between the All Writs Act and this Court's jurisdiction.

The All Writs Act provides that the "Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. Sec. 1651(a).

In *United States v. New York Tel. Co.*, 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977), the Court concluded that the All Writs Act authorizes a federal court to

> issue such orders against persons "who though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice."

Our Circuit, following these principles, has held that "where the district court exercises its jurisdiction to rule on the merits of a litigation, it determines that the law requires a certain outcome and is empowered to issue remedial orders to effectuate that outcome. By power of the All Writs Act, it may require the compliance of nonparties in order to ensure that

its legally mandated directives are not frustrated." *Association for Retarded Citizens of Connecticut, Inc. v. Thorne,* 30 F.3d 367, 369 (2d Cir.1994); *see also, Benjamin v. Malcolm,* 803 F.2d 46, 53 (2d Cir.1986). Our Court of Appeals has emphasized that the Act "authorizes a federal court in exceptional circumstances to issue such orders to persons 'who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice.' " *Yonkers Racing Corporation v. City of Yonkers,* 858 F.2d 855, 863 (2d Cir.1988) *cert. denied* 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989) (citations omitted). *See Pennsylvania Bureau of Correction v. U.S. Marshals Serv.,* 474 U.S. 34, 43, 106 S.Ct. 355, 361, 88 L.Ed.2d 189 (1985); *In re Baldwin–United Corp.,* 770 F.2d 328 at 336 (2d Cir.1985).

Here, exceptional circumstances exist. The parties to this dispute, including the District, have now been involved in protracted negotiations and lawsuits for a period spanning more than two years. The purpose of this Court's August 1999 injunction was to facilitate the construction of the cell tower. The specific impediment at that point was the State Board's refusal to issue a permit; the general impediment was the skittishness of parents and local officials about adopting to new technology, typified by concerns—almost to the point of superstition—about RF Emission levels.

The District, of course, knew about the pendency of the litigation involving the State Board and watched it evolve. Having done that, the District seeks to require Sprint to litigate its contractual differences leisurely and from scratch in state courts. Without affording Sprint emergency relief, this tactic would insure that the District or, presumably any party, who feels aggrieved by the construction of cellular facilities could rather easily frustrate the important Congressional policies underpinning the TCA of 1996 by requiring wireless service providers to spend lengthy periods in litigation. This litigation could be staggered so no end would be in sight. These steps, however, are incompatible with the express commands of Congress in the TCA that new wireless technology be deployed as quickly as possible and that litigation frustrating that deployment be resolved as expeditiously as possible.

In passing the Telecommunications Act of 1996, Congress unmistakedly signaled that its intention that the new wireless technology be disseminated nationally as rapidly as possible, and that, with limited exception, technical issues and standards were to be set and controlled by the FTC, that lawsuits arising under the TCA be resolved expeditiously and, most importantly, that local efforts to frustrate the implementation of this national policy be curtailed. Pub.L. No. 104–104, 110 Stat. 56, 56 (1996); *see also* H.R. Conf. Rep. No. 104–458, at 113 (1996), 1996 U.S.C.C.A.N. 124, 124. The All Writs Act serves this end.

## II.

■ Turning to the merits of the dispute, the District contends that it properly refused to permit Sprint to install the Facility unless it agreed to operate it at the greatly heightened RF Emission level because Sprint voluntarily agreed in the lease to meet this contractual standard and the enforcement of that provision is not barred by the TCA. This Court rejects this contention for several reasons.

The District's interpretation of the Lease and the addendum is at odds with their text. The Lease committed Sprint to comply with all current FCC regulations pertaining to RF Emissions (paragraph 1b). The October 21, 1998 Addendum committed Sprint to an RF level 13,000 below federal standards, but only in regards to equipment "as originally installed." Sprint was also permitted under the Lease to make "such improvements on the site as it deems necessary from time to

time for the operation of Sprint's system" (paragraph 7). These provisions, taken together, allow Sprint to install new equipment to recognize evolutions in technology so long as the new equipment complied with federal RF Emissions standards. Neither party disputes that the equipment Sprint proposes to install will comply with this standard.

■ In addition to being inconsistent with the lease addendum, the District's argument is inconsistent with the TCA. Section 704 of the TCA bars state and local governments and municipalities from regulating the "placement, construction or modification" of wireless services on the bases on the health affects of RF Emissions where the facilities would operate within the levels determined by the FCC to be safe. *See* 47 U.S.C. 332(c)(7)(B)(iv). Section 704 also provides that "the regulation of the placement, construction, and modification of personal wireless service facilities by any state or local government or instrumentality thereof shall not prohibit or have the effect of prohibiting the provision of personal wireless services" 47 U.S.C. Sec. 332(c)(7)(B)(i)(II).

The District contends that § 704 does not only apply because, in seeking to enforce contractual provisions in the lease and addendum, it is not acting in a "regulatory" capacity as a "state or local government or instrumentality thereof", but as a private property owner and, accordingly, is free to permit access to its property on any basis it chooses.

■ However, under New York law, the District is an instrumentality of the state of New York. *See City of New York v. State,* 86 N.Y.2d 286, 631 N.Y.S.2d 553, 655 N.E.2d 649 (1995). The statute does not contain language supporting or implying a distinction between a local instrumentality acting in a regulatory capacity and a local government acting as a property owner. Since to "regulate" means "to fix the time, amount, degree or rate of (as by adjusting, rectifying)"; it is clear that the District is undertaking to regulate RF emissions. *Webster's Third New International Dictionary,* def. 3.[1] *See Cellular Phone Taskforce v. FCC,* 205 F.3d 82 (2d Cir.2000) (state and local governments exercising their local power "may not regulate personal wireless service facilities that conform to the FCC Guidelines on the basis of the environmental effects of RF radiation.") Where a statute is clear on its face, the job of this Court is to apply it. [citation]

■ Finally, and perhaps most importantly, it is clear that the FCC's jurisdiction over technical matters associated with RF Emission levels is exclusive and preempts private contractual arrangement like the one at issue here. When the FCC established the Federal RF Safety Standard in 1996, it "announced, *inter alia,* a rule that prohibited state and local governments from regulating any personal wireless service facilities based upon perceived health risks posed by RF emissions as long as the facilities conformed to the FCC Guidelines regarding such emissions." *Cellular Phone Taskforce,* 205 F.3d at 88. When the Second Circuit examined the scope and pre-emptive effect of the Federal RF Safety Standard, it held:

the Act preempted state and local governments from regulating the placement, construction or modification of personal wireless service facilities on the basis of the health effects of RF radiation where the facilities would operate within the levels determined by the FCC

1. The statute's legislative history specifies the Act's prohibitions on third-party RF emissions standards in cellular tower siting cases without resorting to the term "regulate". The legislative history shows that "the House amendment also required the [Federal Communications] Commission to complete its pending Radio Frequency (RF) emission exposure within 180 days of enactment. *The siting of facilities could not be denied on the basis of RF emission levels for facilities that were in compliance with the Commission standard* [11 F.C.C. Rcd. 15123 (1996)]." 142 Cong. Rec. H1078–03, *H1134 (emphasis added).

to be safe. *See* 47 U.S.C. § 332(c)(7)(B)(iv). *Id.*

More recently, the Court considered regulatory preemption under the TCA in *Freeman v. Burlington Broadcasters*, 204 F.3d 311, 320 (2d Cir.2000), and held that the Federal RF Safety Standards totally pre-empt conflicting attempts to regulate RF emissions:

> Of the various forms of federal preemption, the most pertinent to the pending inquiry is so-called "field preemption": state law is preempted when the "scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the Sates to supplement it." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). As is always the case in preemption analysis, Congressional intent is· the "ultimate touchstone." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (internal quotation marks and citations omitted). Consistent with this view of the importance of congressional intent, the Supreme Court has explained that "field preemption may be understood as a species of conflict pre-emption: a state law that falls within a pre-empted field conflicts with Congress's intent (either express or plainly implied) to exclude state regulation." *English v. General Electric*, 496 U.S. 72, 79 n. 5, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990); *see also* 1 Laurence H. Tribe, American Constitutional Law § 6–31 (3d ed.1999).

Consistent with its decisions in *Freeman* and *Cellular Phone Taskforce v. FCC*, the Court of Appeals has further noted that the doctrine of field preemption prohibits local governments and (instruments thereof, such as the District) from setting RF Emission standards more stringent that those set by the FCC. Addressing the issue of RF emissions, the Court stated:

> State and local governments are not required to approve or prohibit anything. The only onus placed on state and local governments exercising their local power is that they may not regulate personal wireless service facilities that conform to the FCC Guidelines on the basis of environmental effects of RF radiation. "[W]here Congress has the authority to regulate private activity under the Commerce Clause, we have recognized Congress' power to offer States the choice or regulating that activity according to federal standards or having state law pre-empted by federal regulation." *New York*, 505 U.S. at 167, 112 S.Ct. 2408; see *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir.1999). We have no doubt that Congress may preempt state and local governments from regulating the operation and construction of a national telecommunications infrastructure, including construction and operation of personal wireless communications facilities. See *New York v. U.S.* at 63–64, 112 S.Ct. 2408; *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. at 698–700, 104 S.Ct. 2694. *Id* at 12. *Cellular Phone Taskforce*, 205 F.3d at 96.

Since Sprint's facility will comply with the Federal RF Safety Standard, the Facility is covered by the preemptive effects of the Federal RF Safety Standard and the District may not impose more stringent standards by rule, regulation or by contract. Other Circuits have reached the same· conclusion. *See Southwestern Bell Wireless, Inc. v. Johnson County Board of County Commissioners*, 199 F.3d 1185, 1194 (10th Cir.1999), holding that "the field of RFI regulation is entirely preempted by federal legislation." *See also Broyde v. Gotham Tower, Inc.*, 13 F.3d 994, 997 (6th Cir.1994), (recognizing the "irreconcilable conflict between FCC's exercise of exclusive jurisdiction over the regulation of radio frequency interference and the imposition of common law standards in a damages action", and that finding no state remedy for RF violations is available.)

When private contractual provisions intrude upon matters regulated by Congress, they are not enforceable. Regardless of intent or convenience, private parties may not agree to alter statutory duties imposed by Congress. *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 224, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986), held that "when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity." The Court found in that "[i]f the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions." *Connolly*, 475 U.S. 211 at 224, 106 S.Ct. 1018, 89 L.Ed.2d 166. *See also, In re Chateaugay Corp.*, 53 F.3d 478 (2d Cir.1995), citing *Connolly* with approval. *Accord United States v. Murtaugh*, 190 F.2d 407, 409 (4th Cir.1951) "it is not within the power of the parties to a contract, subject to valid governmental regulation, to frustrate the will of Congress and to ignore pro tanto its legislative fiat." *See Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946).

### CONCLUSION

As our Court of Appeals recognized in *Yonkers* and elsewhere, the All Writs Act confers upon this Court the authority to bind non-parties. The Act serves to protect the Court's [jurisdiction] and to effectuate the important public policies behind the TCA. Sprint has demonstrated a high likelihood of success on the merits, as well as irreparable harm that will result from the District's failure to comply with the TCA.

Accordingly, a permanent injunction will issue enjoining the District and all persons with actual knowledge of the injunction from seeking to require in any forum, except on direct appeal in this case, Sprint to operate its facility at any RF Emission Level, except the level authorized by the TCA of 1996.

Settle a judgment in 10 days on 5 days notice, or on waiver of notice.

**SO ORDERED.**